## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KARI L. SANDERS, | ) | CASE NO. 4:08CV3125 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| vs. | ) | AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the Court on the denial of two applications the Plaintiff made under the Social Security Act.  The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401 *et seq.* (Transcript ("Tr.") at 70-72).  The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* (Tr. at 401-03, 430-36). Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

### PROCEDURAL BACKGROUND

The Plaintiff, Kari L. Sanders ("Sanders"), filed her initial application for SSI benefits on June 23, 2003.  (Tr. at 15).  The claim was denied initially on November 17, 2003, and again on reconsideration on June 16, 2004. (Tr. at 15).  An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on January 12, 2006. (Tr. at 516). Following the hearing, Plaintiff submitted additional evidence. (Tr. at 417-425 & 457-480). On June 2, 2006, the ALJ issued a decision finding that Sanders was not "disabled" within the meaning of the Act and therefore not eligible for benefits under the Act.  (Tr. 15-25).

On May 5, 2008, the Appeals Council denied Sanders's request for review. (Tr. at 6). Sanders now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA"). (Filing No. 1).

Sanders argues that the ALJ's decision was incorrect because 1) the ALJ's conclusion was not supported by substantial evidence on the record; 2) the ALJ failed to evaluate her mental health impairments; 3) the ALJ failed to give controlling weight to the medical opinions of Sanders's treating physicians; 4) the ALJ failed to consider and give appropriate weight to the medical opinion of consulting physician Dr. Ullman; 5) the ALJ failed to discuss the type, dosage, effectiveness, and side effects of Plaintiff's medications; 6) the ALJ failed to consider the third-party statement of Tara Eltiste; 7) the ALJ erred because the testimony of the Vocational Expert supports a finding of disability; and 8) new evidence from Richard V. Andrews, M.D., (Plaintiff's treating physician) warrants reversal.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole, and the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

In her applications for disability insurance benefits and supplemental security income, Sanders asserts a disability onset date of March 5, 2003, and that she is unable to work due to seizures.  (Tr. at 70, 84, & 401).

### DOCUMENTARY EVIDENCE BEFORE THE ALJ

Kari L. Sanders is thirty-three years of age; she is a high school graduate and has obtained approximately 140 hours of college credit without obtaining a degree. (Tr. at 523). Intellectual testing suggests she is bright (Tr. at 361). Sanders has held employment in the

2

area of food service where she has worked as a cook, hostess, waitress, bartender, and in management.  In addition to food service, she has worked as a telemarketer. (Tr. at 186-191 & 525-527).

Sanders suffered a traumatic brain injury in 1985 as a child and her medical history reflects that she has suffered from a seizure disorder since approximately 1993.  (Tr. at 326).  On December 26, 2002, Sanders presented to Fremont Area Medical Center, where doctors performed magnetic resonance imaging (MRI) of her brain and compared the results to computed tomography (CT) scans dating March 14, 1995, and March 5, 1986. (Tr. 203). The December 2002 exam revealed that a large area of encephalomalacia was present in the inferior aspect of the right frontal lobe.  This appearance was unchanged from the 1995 CT scan and in the same area as the hemorrhage that resulted from the trauma of Sanders' fall in 1985. Otherwise, the exam of her brain was normal, with "no mass, mass effect or evidence of acute infarction" present. (Tr. at 203).

Sanders was hospitalized at the St. Elizabeth Regional Medical Center from April 17, 2003, through April 20, 2003, after presenting to the emergency room stating she had been experiencing increasing seizure activity over the last week and had experienced three seizures while at home alone that evening. (Tr. at 301).  The hospital performed a computed tomography (CT) on April 17, 2003 (Tr. at 310).  The results showed a prominent right frontal lobe defect related to Sanders's previous hematoma resulting from her fall in childhood, but were negative for acute intracranial changes. (Tr. at 310).   An electroencephalogram (EEG) was performed on April 18, 2003. (Tr. at 311).  G. L. Pattee, M.D., stated the results were mildly abnormal without evidence of true spike-wave discharge (Tr. at 311).

3

Sanders was again hospitalized at St. Elizabeth Regional Medical Center from April 22, 2003, through April 28, 2003. (Tr. at 217-226), after presenting to the emergency room complaining of increased frequency of seizures. (Tr. at 217).   At that time, Sanders informed the emergency room physician that she had quit drinking alcohol one month ago. (Tr. at 212).  J. Bobenhouse, M.D., performed a consultative neurological examination of Sanders and diagnosed her with a mixed seizure disorder (Tr. at 212-13).  The EEG was abnormal and most consistent with non-epileptic seizure-like activity. (Tr. at 226).  A magnetic resonance imaging (MRI) of her brain was normal except for the area related to her prior closed head injury. (Tr. at 215 & 224). Upon discharge, J. Shiffermiller, M.D., stated Sanders's vital signs upon initial physical examination were completely normal and the remainder of her examination was unremarkable (Tr. at 205).  Dr. Shiffermiller stated that he eventually stopped treating Sanders' seizures while she was hospitalized because, according to the EEG, most or all of the events were pseudoseizures. (Tr. at 205).

Richard V. Andrews, M.D., Sanders's treating physician, examined her on May 12, 2003 (Tr. at 237-38).  Plaintiff stated she saw a therapist intermittently as a teenager, but had not seen a therapist or mental health specialist for quite some time. (Tr. at 237).  Dr. Andrews "strongly recommended" that Plaintiff enroll in a "therapeutic counseling program which would be goal oriented towards seeking out those aspects of her psychi, responsible for prompting the nonepileptic seizures and then attempting to therapeutically intervene." (Tr. at 238).

On May 21, 2003, Dr. Andrews echoed the findings of the doctors at St. Elizabeth Regional Medical Center when he questioned whether Sanders's events were truly epileptic or possibly mixed in character. (Tr. 231 & 235).  Dr. Andrews noted Sanders had an

4

abnormal EEG apparently showing some epileptic activity, but at other times her EEG was normal (Tr. at 231-234).  Dr. Andrews concluded that the EEG showed that her seizures were "fairly clearly non-epileptic in origin," and that some findings were "often associated with other overt structural defects or abnormalities of the cortical organization." (Tr. at 232 & 234).

On June 11, 2003, James E. Smith, M.D., treated Sanders in the Bryan LGH Medical Center emergency room. (Tr. at 243-44).  Sanders stated she had been watching a movie and drinking alcohol when she began having a seizure. (Tr. at 243).  Dr. Smith noted that Sanders' records showed a fairly normal EEG without any correlation to the seizure activity. (Tr.  at 244).

Robert G. Arias, Ph.D., performed a consultative neuropsychological evaluation of Sanders on July 9 and July 16, 2003. (Tr. at 359-62).  Dr. Arias diagnosed her with a conversion disorder with seizures or convulsions, a cognitive disorder secondary to a cerebrovascular accident, a depressive disorder, and polysubstance abuse by history. (Tr. at 359). Dr. Arias recommended psychotherapy to improve Sanders' ability to cope with stress and reduce her conversion symptoms. (Tr. at 359).  At that time, Dr. Arias noted that Sanders's alcohol use was described as "significant," as she was "consuming alcohol on average of three to four days per week on average of three to four beers but up to seven or eight drinks." (Tr. at 360).

Dr. Andrews dictated a medical report on July 16, 2003, stating he had followed Sanders since late April 2003 for "very difficult to control epilepsy syndrome." (Tr. at 253). Dr. Andrews reported that Sanders had a variety of non-epileptic events that were provoked by an anxiety depression syndrome. (Tr. at 253).  He stated Sanders had been

5

working as a chef and had been "unable to return to work because of our lack of ability to guarantee that she will be totally seizure free in any kind of work or non-work environment." (Tr. at 253).  The physician further opined that, "because of [Sanders's] vocation and my inability to absolutely guarantee her employer that she will be seizure free, it has been virtually impossible for her to sustain competitive employment. She has been unable to find alternative full-term employment." (Tr. at 253).

Tom Chael, M.D., a State agency physician, reviewed the medical evidence of record on November 13, 2003, and completed a physical residual functional capacity ("RFC") assessment. (Tr. at 263-65).  Dr. Chael opined that Sanders did not have any exertional limitations. (Tr. at 257).  Dr. Chael also reasoned that Sanders could frequently climb, balance, stoop, kneel, crouch, and crawl and must avoid concentrated exposure to hazards. (Tr. at 258 & 260). Dr. Chael also concluded that there was "documentation that the claimant drinks alcohol daily and is not consistently compliant with medication." (Tr. at 262).

Sanders presented to St. Elizabeth Regional Medical Center's emergency room again on December 23, 2003, stating she hit her head during a seizure. (Tr. at 288-89). Sanders reported having consumed six alcoholic drinks the night before. (Tr.  at 288). Terry L. Rounsborg, M.D., reported Sanders was intact neurologically with no focal findings and a CT of the head was negative except for old encephalomalacia of the right frontal area. (Tr. at 288-89).  Dr. Rounsborg discussed with Sanders the "increased incidence or risk of seizures with alcohol use." (Tr. 289).

Dr. Andrews dictated a medical report on March 24, 2004, stating that he had treated Sanders for approximately one year. (Tr. at 266).   Dr. Andrews reported that

6

Sanders "has nonepileptic seizures and suffers from a severe anxiety syndrome." (Tr. at 266-67).   The physician stated Sanders was being treated aggressively, but was "not necessarily responding particularly well." (Tr. at 266-67).   Dr. Andrews stated it was his understanding that she was being treated by a psychiatrist. (Tr. at 266-67).   Sanders described her anxiety disorder as leaving her "paralyzed" and unable to leave her home regularly. (Tr. at 266-67).   Dr. Andrews opined that Sanders was "functionally disabled and cannot function reasonably independently without either supervision or a companion." (Tr. at 266-67).

On April 24, 2004, Sanders presented to the St. Elizabeth Regional Medical Center's emergency room, after having experienced four seizures in one evening. (Tr. at 282 & 366). Sanders stated she had been drinking alcohol. (Tr. at 282 & 366).   Tests confirmed the presence of a high level of alcohol in Plaintiff's blood (19.7 mg/dL). (Tr. at 283, 285, & 367).

Daniel L. Ullman, Ph.D., performed a consultative psychological evaluation of Sanders on May 11, 2004. (Tr. at 324-28).   Dr. Ullman stated Sanders was alert and able to sustain attention and concentration upon examination. (Tr. at 326).   Her memory functioning was assessed in the superior range, although Dr. Ullman noted that her memory functioning was affected by her seizure disorders. (Tr. at 326 & 328).   The psychologist opined that she would likely pick up tasks very quickly and would be able to carry out short and simple instructions under ordinary supervision. (Tr. at 327).   Dr. Ullman opined that Sanders possibly would have difficulties relating appropriately to coworkers and supervisors when there were transient mental effects from her seizures and when feeling suspicious and mistrustful of others. (Tr. at 327).   Dr. Ullman related Sanders presented with a restricted or blunted affect and appeared depressed. (Tr. at 327).   Sanders stated

7

she was taking Effexor, which helped with her mood disorder, and also related she was seeing an outpatient therapist at the Community Mental Health Center (Tr. at 328). Sanders told Dr. Ullman she consumed alcohol about twice a week, having one or two beers at a time. (Tr. at 326).  Dr. Ullman diagnosed Sanders with a mood disorder and provisional and transient cognitive and mental disorders due to epilepsy. (Tr. at 327).

On July 12, 2004, Dr. Semin performed a preoperative examination of Sanders before she underwent an MRI of the cervical spine for neck and shoulder pain. (Tr. at 370-71).  Dr. Semin stated he had not seen Sanders since July, 2002. (Tr. at 370). Following an examination, Dr. Semin diagnosed her with a head injury at a young age, a seizure disorder, benzodiazepine abuse and dependence, arthralgia, recurrent nausea, and menorrhagia. (Tr. at 371).  Dr. Semin stated Sanders was not eating well, was overusing benzodiazepines and drinking large amounts of alcohol, as well as having problems with medication abuse and dependence. (Tr. at 371). Dr. Semin stated he was sure these factors contributed to her recurrent emergency room visits. (Tr. at 371).

Sanders followed-up with Dr. Semin on July 29, 2004. (Tr. 375).  The physician related a review of her medications, indicating that she was taking between 4 and 16 clorazepate1 daily and drinking 5 to 6 beers per day. (Tr. at 375).  Sanders told Dr. Semin she took clorazepate in the morning just "to wake up" (Tr. at 375).  Sanders described recent difficulty with seizures, which she stated occurred in her sleep. (Tr. at 375).  Dr. Semin stated he was not sure how to confirm whether Sanders was really having seizures, noting multiple emergency room visits during which there was a question of whether she had seizures or pseudoseizures. (Tr. at 375).  Sanders refused to undergo drug and alcohol treatment as recommended by Dr. Semin (Tr. 375). Dr. Semin reasoned there was

8

a good chance that her seizures were a result of withdrawal from clorazepate on days when she took a lesser amount. (Tr. at 375). Dr. Semin instructed her to decrease her alcohol and clorazepate intake slowly. (Tr. at 375).

On August 11, 2004, Dr. Semin saw Sanders again. (Tr. at 374). Dr. Semin stated that Sanders had problems with recurrent seizures, which he attributed in part to her drug and alcohol abuse. (Tr. at 374). Dr. Semin assessed Sanders with alcohol abuse, benzodiazepine abuse, and a seizure disorder. (Tr. at 374). Dr. Semin reiterated that Sanders should go into a treatment program, but she refused, indicating she would cut down on alcohol, but not completely stop it. (Tr. at 374).

On November 17, 2004, Sanders followed-up with Dr. Semin. (Tr. at 373). At that time, she stated she was completely off both clorazepate and alcohol. (Tr.  at 373). Sanders also reported that she had not had any tonic/clonic seizures. (Tr. at 373). Dr. Semin referred her to psychiatry for symptoms of depression with fatigue and lack of energy and motivation. (Tr. at 373).

Dr. Semin completed a medical source statement of ability to do physical work-related activities on September 7, 2005. (Tr. at 393-96). Dr. Semin concluded that Sanders had no exertional limitations. (Tr. at 393-94). He reported that she could frequently climb, balance, kneel, crouch, crawl, stoop, reach, handle, finger, and feel. (Tr. at 394-95). He found that Sanders required limited exposure to noise, fumes, odors, chemical, and gases. (Tr. at 396). Dr. Semin added that he had not seen Sanders since November 2004, at which time her issues were related to psychiatry and medication abuse problems. (Tr. at 396). Dr. Semin stated he did not know of any current seizure problems and did not currently feel Sanders was physically disabled. (Tr. at 396).

9

On October 14, 2007, Sanders was admitted to Bryan LGH Medical Center for a suicide attempt by overdose of her prescription medications. (Tr. at 492). She was acutely intoxicated, with a high blood alcohol level. (Tr. at 492, 494, & 504). Dr. Stephen Paden recommended that Sanders start counseling with Lutheran Family Services to address her alcohol issues, which he reasoned were a significant contributing factor to her overdose. (Tr. at 496-497). He noted that the counseling services at Lutheran Family Services were available to individuals on a sliding scale. (Tr. at 497).

ADMINISTRATIVE HEARING

### Claimant's Testimony

On January 12, 2006, Sanders testified at the hearing in front of the ALJ. (Tr. at 516). She testified to her work history (Tr. at 525-527) and explained that her seizures occurred multiple times per week, if not per day, each lasting between five minutes to a half an hour. (Tr. at 532). Sanders further testified that she didn't need drug and alcohol treatment because she could quit taking her medicines at home, and her drinking was not a problem other than on one or two occasions under extreme circumstances. (Tr. at 532).

### Vocational Expert

A vocational expert ("VE") testified at the hearing and classified Sanders's past relevant work as a bartender and waitress as semi-skilled, both at the light exertional level, as performed in the national economy, and at the medium exertional level, as performed by Sanders. (Tr. at 548). Her work as a telemarketer was semi-skilled at the sedentary exertional level as performed in the national economy, and her job as a restaurant manager was a skilled position as performed at the light exertional level in the national economy and

10

at the medium exertional level as performed by Sanders. (Tr. at 548).  Her past relevant

work also included a position as a cook, which was a skilled job performed at the medium

exertional level in the national economy and as performed by Sanders (Tr. at 183 &  547).

In response to the ALJ's hypothetical question, the VE testified that such a person could

perform Sanders's past relevant work as a bartender, telemarketer, waitress, and

restaurant manager. (Tr. at 23 & 547-48).  The VE additionally testified that such a person

could perform light work as an assembler, packager, and charge account clerk. (Tr. at 23

& 547-48).

However, when the ALJ presented the VE with a hypothetical that included all of

Sanders's testimony as credible, the VE concluded that Sanders would "not be able to

return to work either in past relevant work or other work." (Tr. at 551).

## EVIDENCE SUBMITTED POST-HEARING

Sanders submitted additional evidence to the Appeals Council after the date of the

ALJ's decision.  Dr. Andrews completed a supplemental questionnaire regarding her mental

RFC on July 25, 2006. (Tr. at 417-25).   In this evaluation, Dr. Andrews reasoned that

Sanders had no limitations in her ability to comprehend and carry out simple instructions

but she was moderately impaired in the ability to make simple work-related decisions, make

social adjustments, use public transportation, be aware of normal hazards, and tolerate

customary work pressures. (Tr. at 418 & 424).   Dr. Andrews further opined that Sanders

was markedly limited in the ability to remember work procedures, remember detailed

instructions, respond appropriately to supervision, perform ordinary routine tasks without

inordinate supervision, respond appropriately to coworkers, deal with the general public,

function independently on a job, complete a normal workday, exercise appropriate

11

judgment, concentrate and attend to a task over an eight-hour period, maintain continuous performance to complete a task, perform routine tasks on a regular, sustained, and productive basis, properly complete sequential tasks, perform at a consistent pace, work a normal eight-hour day without psychologically based interruptions, work according to a schedule, abide by occupational rules, and maintain social functioning. (Tr. at 418-23).

Dr. Andrews concluded that while Sanders "has an epileptic seizure disorder which is well controlled on monotherapy with Keppra in moderate to moderately high doses . . . [, she] remains very much totally disabled and unable to compete in the workforce for either a full or part time job." (Tr. at 457).

## THE ALJ'S DECISION

The ALJ followed the sequential evaluation process set out in 20 C.F.R. § 416.920 to determine whether Sanders was disabled, considering any current substantial gainful work activity, the severity of any medically determinable impairment(s), and Sanders's residual functional capacity with regard to her ability to perform past relevant work or other work that exists in the regional and national economies. (Tr. at 15-25).

Following this analysis, the ALJ concluded Sanders was not "disabled" under the Act. (Tr. at 24). Specifically, the ALJ first found that since March 5, 2003, Sanders had not performed any substantial gainful work activity. (Tr. at 23). Next, the ALJ found that Sanders had the following medically determinable impairments that were "severe" within the meaning of the SSA's regulations: a seizure disorder with non-epileptic seizure activity, and an affective mood disorder. (Tr. at 24). Having determined that Sanders did have two severe medically determinable impairments, the ALJ concluded that Sanders's impairments, either singly or collectively, did not meet section 12.04 or any other section

12

of Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings." (Tr. at 24).

At the next step, the ALJ determined that, despite Sanders's medically determinable impairments, she still could perform basic work-related functions. (Tr. at 24). The ALJ reasoned that she could "perform the exertional requirements of at least medium labor, i.e., she can occasionally lift-carry items weighing up to 50 pounds; frequently lift/carry items weighing up to 25 pounds; sit for 6 hours during the course of an 8-hour workday; and frequently bend, squat, stoop, kneel and crawl." (Tr. at 24). As a result, the ALJ found that Sanders was "able to perform her past relevant work as a bartender, telemarketer, waitress, and restaurant manager." (Tr. at 24).

In so deciding, the ALJ weighed Sanders's testimony, finding the testimony "not credible." (Tr. at 22 & 24). The ALJ also carefully considered the medical records submitted by treating and consultative physicians. (Tr. at 16-23). The ALJ stated she found Sanders's subjective testimony regarding her alleged disability "not credible" for several reasons, the most significant being Sanders's "ongoing use of alcohol even though she has been warned by Dr. Semin that alcohol could aggravate if not precipitate her seizures" as well as "her questionable compliance with her treatment regimen." (Tr. at 22).

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)("As we have stated many times, we do not reweigh the evidence presented to the ALJ."); *Harris v. Shalala,* 45 F.3d 1190, 1193 (8th Cir. 1995)(holding that the district court does not "reweigh the evidence or try the issues de novo."). Rather, the

13

district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Harris,* 45 F.3d at 1193.

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Holmstrom v. Massanari,* 270 F.3d 715, 720 (8th Cir. 2001). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision.  *Id.*  As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *McKinney v. Apfel,* 228 F.3d 860, 863 (8th Cir. 2000); *Harris,* 45 F.3d at 1193.

## DISCUSSION

### "DISABILITY" DEFINED

An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be of such severity that the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). If the claimant argues that she has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without

14

regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B).

### 1. WHETHER SUBSTANTIAL EVIDENCE IN THE RECORD SUPPORTS THE ALJ'S FINDINGS

A thorough review of the record in this matter leads the Court to conclude that the ALJ's findings are supported by substantial evidence. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Massanari,* 270 F.3d at 720. While Sanders can point to evidence that could support a finding of disability, this Court "may not reverse [the ALJ's decision] because substantial evidence exists in the record that would have supported a contrary outcome." *McKinney*, 228 F.3d at 863.

While there is some evidence that could be used to support a finding of disability, the record overwhelmingly consists of evidence that supports the ALJ's conclusion. The record clearly shows that while Sanders does suffer from seizures, many of her physicians concur that these seizures are mostly pseudo-seizures and not epileptic in nature. (See, e.g., Tr. at 205, 226, 231, 235, 238, 253, 261, 266, & 375). Furthermore, the record is replete with evidence indicating that many physicians have advised Sanders that her abuse of alcohol greatly contributes to her psuedo-seizures. (*See, e.g.,* Tr. at 262 & 371). Despite the fact that she has been advised to stop drinking and seek psychiatric treatment, she has refused to do so. The ALJ, in reliance on this evidence in the record, deemed Sander's' testimony "not credible" and instead relied on the VE's testimony that jobs do exist in great numbers that Sanders can perform.

15

As a result, this Court finds that there is substantial evidence in the record to support the ALJ's decision and, consequently, will not reverse the ALJ's decision.

### 2. WHETHER THE ALJ FAILED PROPERLY TO EVALUATE SANDERS'S MENTAL IMPAIRMENT

Plaintiff contends that the ALJ failed properly to consider her mental impairment when assessing her RFC to work. The evidence in the record, however, does not support this contention. Instead, the record indicates the ALJ considered several medical opinions regarding Plaintiff's mental health in the assessment of Plaintiff's RFC.

First, the ALJ considered Plaintiff's "neuropsychiatric evaluation conducted by Robert Aris, Ph.D." (Tr. at 17). Additionally, in her decision, the ALJ discussed at great length the "mental status examination and psychological testing conducted by Daniel Ullman, Ph. D., on May 20, 2004." (Tr. at 18). The ALJ noted that "Dr. Ullman opined that Ms. Sanders has the ability to sustain concentration and attention needed for task completion, understand and remember short and simple instructions, and carry out short and simple instructions under ordinary supervision. It was thought that there 'could be possible difficulties with her relating appropriately to co-workers and supervisors when there are transient mental effects from her seizures and when she's feeling suspicious and mistrustful of others.'" (Tr. at 19 (quoting Exhibit 11F)).

The RFC assessment completed by Tom Chael, M.D., a State agency physician, also constitutes substantial evidence on the record to support the ALJ's RFC findings. On November 13, 2003, Dr. Chael reviewed the medical evidence and completed his assessment. (Tr. at 263-65). After reviewing Sanders's medical record, Dr. Chael concluded that "[a]lthough the claimant does not list any limitations due to a mental

16

impairment, Dr. Andrews stated that she has non-epileptic events provoked by anxiety depression syndrome.  However, the claimant denied a history of anxiety and depression at a 04/17/03 consultation.  There is no clear mental medially determinable impairment that would limit her ability to carry daily activities." (Tr. at 261).

The contention that the ALJ simply failed to evaluate the Plaintiff's medical impairments is unfounded and plainly contradicted by the record.

### 3.   WHETHER THE ALJ ERRED WHEN SHE FAILED TO GIVE CONTROLLING WEIGHT TO SANDERS'S TREATING PHYSICIANS' OPINIONS

Plaintiff asserts that the ALJ erred when she failed to give controlling weight to Plaintiff's treating physicians' opinions.  Specifically, she asserts the ALJ should have adopted Dr. Semin's opinion that "'Carrie [sic] is not able to work at this time.'" (Filing No. 12 at 15 (quoting Tr. at 372)) and Dr. Andrews's opinion that Sanders is "'literally prohibited from working or even pursuing gainful employment because of the frequency and severity of these events.'" (Filing No. 12 at 15 (quoting Tr. at 253)).

Although "a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole." *Cruze v. Chater*, 85 F.3d 1320, 1324 -1325 (8th Cir. 1996).  "Second, statements that a claimant could not be gainfully employed 'are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Secretary.'" *Id.* (quoting *Nelson v. Sullivan*, 946 F.2d 1314, 1316 (8th Cir.1991)).

Thus, Dr. Semin's and Dr. Andrews's statements that Sanders cannot work due to her medical condition are not medical opinions, but rather, they are statements regarding the application of the statute.   As a result, the ALJ need not attribute controlling weight to

17

their statements regarding the application of the statute; instead, the Eighth Circuit Court of Appeals has held that to be a "task assigned solely to the discretion of the Secretary." *Id.*

### 4.   WHETHER THE ALJ FAILED ADEQUATELY TO CONSIDER THE CONSULTATIVE PSYCHOLOGICAL OPINION OF DR. ULLMAN

Sanders argues that the ALJ failed to "discuss or discredit and therefore ignored Dr. Ullman's consultative psychological opinion. . . ." (Filing No. 12 at 16).  A quick review of the ALJ's decision proves otherwise.  To the contrary, the ALJ devoted almost a full page of discussion to Dr. Ullman's findings. (*See* Tr. at 18-19).  The ALJ discussed Dr. Ullman's findings, noting that Sanders's "delayed memory performance was in the "very superior range' for individuals her age . . . [and] that [Sanders] was alert and able to sustain attention/concentration upon examination . . .She presented with restricted or blunted affect and also presented as depressed. . . Dr. Ullman diagnosed a mood disorder (NOS), and stated that there appeared to be a restriction of activities of daily living due to her ongoing seizure disorder 'as she described it.' . . ." (Tr. at 18-19).

The argument that the ALJ failed to discuss Dr. Ullman's medical evaluation of Sanders is completely unfounded.

### 5.   WHETHER THE ALJ ERRED WHEN SHE FAILED TO CONSIDER OTHER FIRST PERSON TESTIMONY REGARDING SANDERS'S SEIZURE IMPAIRMENT

In her brief, Sanders asserts that the ALJ committed error by failing specifically to discuss and by dismissing the testimony of her friend, Tara Eltiste.  Ms. Eltiste did not testify at the hearing, but instead submitted a two-page letter detailing her memory of two of Sanders's seizures that Ms. Eltiste witnessed. (Tr. at 184-185).  Sanders claims 20

18

C.F.R. § 404.1529(c)(3) requires the ALJ to consider fully Ms. Eltiste's account of Sanders's alleged disability.

While the ALJ must consider the testimony of a third person, the ALJ need not detail the exact reasons why the ALJ deems that third person's testimony "not credible" if that witness's testimony may be discredited by the same evidence the ALJ used to discredit the claimant's testimony. *See Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995)(holding that the "arguable deficiency of failing to specifically discredit [a] witness has no bearing on outcome when the witness's testimony is discredited by the same evidence that proves claimant's claims not credible.")(citing *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir.1992)).  As discussed in greater detail above and below, the Court finds substantial evidence in the record supports the ALJ's determination that Plaintiff's testimony is not credible.  The ALJ determined that Sanders's subjective statements regarding her physical limitations are not credible due to her repeated failure to obey her prescribed treatment and her persistent abuse of alcohol, despite warnings from several doctors that her abuse of alcohol significantly contributes to her medical condition.  Although the ALJ did not delineate these specific reasons as a justification for declining to deem Ms. Eltiste's descriptions of Sanders's physical seizures as credible evidence regarding her disability, the ALJ was not required to do so.

"While it is preferable that the ALJ delineate the specific credibility determinations for each witness, an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)(internal quotations omitted).  In this case, where Ms. Eltiste's testimony merely describes two specific examples of Plaintiff's

19

seizures and thus has no real bearing on the outcome of the ALJ's decision, this Court is not required to reverse the ALJ's entire decision because of the ALJ's mere failure to list her specific reasons for discrediting Ms. Eltiste's testimony.

### 6.  WHETHER THE ALJ ERRED WHEN SHE FAILED TO CONSIDER THE TYPE, DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF SANDERS'S MEDICATIONS

Sanders also argues that there is no evidence in the record that the ALJ actually considered the side-effects of her medications.   She asserts that 20 C.F.R. § 404.1529(c)(3)(i), (ii), (iii), (iv), SSR 96-7p, and SSR 96-8p require the ALJ to consider any side-effects of her medications, since SSR 96-8p mandates that the RFC assessment "be based on all of the relevant evidence in the case record."   On pages 192-96 of the Transcript, Sanders listed any and all side-effects of her current and past medications.

While 20 C.F.R. § 404.1529(c)(3) does require an ALJ to consider a claimant's subjective statements regarding the side-effects of any prescribed medications, the Eighth Circuit Court of Appeals has recognized some instances in which the record demonstrates no necessity for the ALJ to discuss the claimant's stated side-effects from medications in the ALJ's decision. *See Hajek v. Shalala*, 30 F.3d 89, 92 (8th Cir. 1994)(dismissing Plaintiff's claim that the ALJ committed error by failing to discuss Plaintiff's statements regarding the side effects of his medications where "there was no evidence that he ever mentioned these side effects to his physicians. Based on this evidence, the ALJ had good reason to reject [the Plaintiff's] subjective complaints. We will therefore not overturn his finding in this regard.").   *See also Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)(holding that the ALJ did not commit error in failing to consider the Plaintiff's complaints regarding side-effects where one of the "inconsistencies cited by the ALJ

20

[included the fact] . . . that he never discussed the side effects of his medication with his doctor or asked for modification of the medication . . . .").

Because Sanders has presented no evidence to indicate that she ever discussed the side-effects of her current medications with her doctors, and because she has never before alleged that any side-effects contributed to her alleged disability, the ALJ did not commit error when she failed to discuss the side effects Sanders lists on pages 192 and 193 of the Transcript.

### 7.   WHETHER THE ALJ ERRED WHEN SHE FOUND SANDERS WAS NOT DISABLED BASED ON THE TESTIMONY OF THE VOCATIONAL EXPERT

Sanders also contends that the testimony of the Vocational Expert ("VE") at the administrative hearing supports her argument that she is "disabled." At the hearing, the VE testified that Sanders could work several jobs found in great numbers in the regional economy, including positions such as: assembler, packager, and charge account clerk. (Tr. at 549-550). If, however, the ALJ were to alter the proffered hypothetical and instead accept all of Sanders's testimony regarding her limitations as credible, then the VE would conclude that Sanders "would not be able to return to work either in past relevant work or other work." (Tr. at 550). Thus, Sanders contends, the ALJ committed error when she deemed Sanders's testimony "not credible." Consequently, Sanders avers that the ALJ should adopt Sanders's testimony as credible and adopt the VE's conclusion that she would not be able to sustain any "past relevant or other work."

The Court has reviewed the ALJ's decision and finds that substantial evidence in the record supports the ALJ's determination that Sanders's testimony is "not credible." The

*Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1986), standard is the guide for credibility

determinations:

> While the claimant has the burden of proving that the disability results
> from a medically determinable physical or mental impairment, direct medical
> evidence of the cause and effect relationship between the impairment and
> the degree of claimant's subjective complaints need not be produced. The
> adjudicator may not disregard a claimant's subjective complaints solely
> because the objective medical evidence does not fully support them.
>
> The absence of an objective medical basis which supports the degree
> of severity of subjective complaints alleged is just one factor to be considered
> in evaluating the credibility of the testimony and complaints. The adjudicator
> must give full consideration to all of the evidence presented relating to
> subjective complaints, including the claimant's prior work record, and
> observations by third parties and treating and examining physicians relating
> to such matters as:
>
> 1. the claimant's daily activities;
> 2. the duration, frequency and intensity of the pain;
> 3. precipitating and aggravating factors;
> 4. dosage, effectiveness and side effects of medication;
> 5. functional restrictions.
>
> The adjudicator is not free to accept or reject the claimant's subjective
> complaints *solely* on the basis of personal observations. Subjective
> complaints may be discounted if there are inconsistencies in the evidence as
> a whole.

*Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1986).

An ALJ is required to make an "express credibility determination" when discrediting

a social security claimant's subjective complaints. *Lowe v. Apfel,* 226 F.3d 969, 971-72

(8th Cir. 2000). The ALJ, however, is "not required to discuss methodically each *Polaski*

consideration." *Id.* at 972.

Deference is generally granted to an ALJ's determination regarding the credibility

of a claimant's testimony. *Dunahoo v. Apfel,* 241 F.3d 1033, 1038 (8th Cir. 2001) (stating

22

that if an ALJ provides a "good reason" for discrediting claimant's credibility, deference is given to the ALJ's opinion, "even if every factor is not discussed in depth.").

If the ALJ finds that the claimant has not been compliant with prescribed medical treatment, the ALJ is justified in disregarding the claimant's subjective testimony regarding his or her disability. *See Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001)(holding that an ALJ may consider noncompliance with medical treatment in his decision to dispense with claimant's subjective complaints); *Guziewicz v. Barnhart*, 114 Fed.Appx. 267, 269 (8th Cir. 2004)(holding that where claimant "had been noncompliant with prescribed medical treatment, including advice to quit smoking," ALJ was justified in determining that claimant's subjective statements were not credible).  In posing hypothetical questions to the VE, the ALJ need only "include those impairments that the ALJ finds are substantially supported by the record as a whole." *Flynn v. Chater*, 107 F.3d 617, 621 (8th Cir.1997).

In her decision, the ALJ lists several reasons justifying her determination that Sanders's testimony was "not credible."  Specifically, the ALJ cited Sanders's "ongoing use of alcohol even though she has been warned by Dr. Semin that alcohol could aggravate if not precipitate her seizures [and] her questionable compliance with her treatment regimen" as two of the reasons why the ALJ dismissed Sanders's subjective statements. (Tr. at 22).

A review of the record reveals that substantial evidence supports the ALJ's credibility determination.  The record is replete with evidence indicating that Sanders consistently failed to comply with medical treatment and continued to abuse alcohol, despite warnings that alcohol could precipitate her seizures. (*See* Tr. at 243 (noting Sanders was drinking alcohol and started to have a seizure); Tr. at 262 (noting there is "documentation that

23

[Sanders] drinks daily and is not consistently compliant with medication"); Tr. at 360 (noting a "significant alcohol history, consuming alcohol on average of three to four days per week on average of three to four beers but up to seven or eight drinks."); Tr. at 365 (noting Sanders has "drank constantly for the last two weeks."); Tr. at 371 (noting that Sanders "is overusing benzodiazepines and drinking large amounts on top of it."); Tr. at 374 (noting Sanders "has problems with recurrent seizures and likely part of it is due to drug and alcohol abuse.").

Substantial evidence supports the ALJ's credibility determination. *See Flynn*, 107 F.3d at 621 ("A vocational expert's testimony based on a properly-phrased hypothetical question constitutes substantial evidence.")(internal quotations omitted).   The ALJ, therefore, was justified in adopting the VE's testimony and concluding that Sanders was "able to perform her past relevant work as a bartender, telemarketer, waitress and restaurant manager." (Tr. at 24).

### 8.   WHETHER THE NEW EVIDENCE FROM DR. ANDREWS WARRANTS REVERSAL OF THE ALJ'S DECISION

Sanders further argues that the ALJ's decision is not supported by substantial evidence in light of additional evidence not considered by the ALJ and presented only to the Appeals Council after the ALJ rendered her decision.   The Court has reviewed the additional evidence submitted by Dr. Andrews and has concluded that the ALJ's decision remains fully supported by the substantial evidence on the record.   This new evidence does not warrant reversal of the ALJ's decision. (*See* Tr. at 417-425 & 457-459).

24

In the new evidence presented to the Appeals Council, Dr. Andrews concludes that Sanders "remains very much totally disabled and unable to compete in the workforce for either a full or part time job." (Tr. at 457).  This statement, however, is "not a medical opinion but an opinion on the application of the statute. *Flynn*, 107 F.3d at 622 (internal quotations omitted).  The ALJ was correct to disregard Dr. Andrew's conclusion in applying the statute, for "applying the statute is a task assigned solely to the discretion of the" Commissioner.  *Id.*

Dr. Andrews further reports Sanders "has an epileptic seizure disorder which is well controlled on monotherapy with Keppra in moderate to moderately high doses." (Tr. at 457).  The Court concludes that this new evidence does not undermine the ALJ's decision as it further substantiates the ALJ's determination that Sanders is not disabled.

Sanders also argues, however, that Dr. Andrews's new evidence supports her claim that she suffers from severe mental impairments that render her disabled.  The ALJ was correct, however, in declining to afford these opinions of Dr. Andrews any controlling weight as, in this regard, Dr. Andrews is a neurologist treating Sanders for seizures, offering his opinions on her mental health condition.  *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").  As Dr. Andrews is a neurologist and is not a mental health specialist, Dr. Andrews's new evidence regarding any potential mental health impairments does not warrant reversal of the ALJ's decision.

25

**CONCLUSION**

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1.    The decision of the Commissioner is affirmed and the Plaintiff's appeal is denied; and

2.    Judgment in favor of the Defendant will be entered in a separate document.

DATED this  29th day of January, 2009.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge